Wachtler, J.
After a nonjury trial, the defendant, Travis Jackson, was found guilty of robbery in the third degree (Penal Law, § 160.05), grand larceny in the third degree (Penal Law, § 155.30) and petit larceny (Penal Law, § 155.25). On this appeal he challenges, inter alia, the denial of his pretrial motions to suppress certain real evidence seized from his room and various inculpatory statements made after he had requested counsel.
At approximately 3:35 p.m. on December 20, 1973, the owner of a pharmacy in Freeport, Long Island, telephoned the police and reported that his store had just been held up at gunpoint by a Black male wearing a tannish-brown full length overcoat and gold rimmed glasses. The owner also reported that the robber had fled in a gold Cadillac with a black top bearing New York license plate number 53 NJW. A few moments later, after hearing the bulletin on their radio, Police Officers Steinberg and Kilbride spotted a vehicle fitting that description with two Black male occupants. They followed the car until it pulled into a driveway in front of 75 West Clinton Street, where they observed a single Black male entering the house through the front door. After reporting their position to headquarters and asking for assistance, the officers approached the house and Officer Steinberg knocked at the front door. Mrs. Davis, the owner of the house, answered and in response to the officer’s inquiries informed him that her son, Larry Davis, had just arrived at home and that he had been driving the vehicle.
The officers then took young Davis into custody and brought him to the First Precinct for questioning, arriving at approximately 4:00 p.m. During the course of the ensuing interrogation Davis informed the officers that he had been with the defendant and that it was the defendant who had gone into the drug store. He also informed them that the defendant and one Margaret Price lived in a rented room in the Davis house.
*148 Subsequently, Mrs. Davis arrived at the station house and informed the police that she wished to help her son and that in order to do so she would assist them in any way possible. According to Officer Steinberg’s testimony at the suppression hearing, they then obtained her consent to a search of her entire house in the hope that they would locate Jackson there. They asked her the specific location of the room rented by the defendant, and Officer Steinberg and Detective O’Connor then returned to the house, gained admission and proceeded toward the defendant’s room. As Steinberg approached the room he observed that the door was open and from the hallway directly outside the room he observed an armoire, or portable closet. The doors to this chest were slightly ajar and protruding from it was a brownish-tan overcoat fitting the description of the one worn by the robber. Steinberg cautiously entered the room and, realizing that Jackson was not there, he then removed the coat from the closet and, in doing so, a pair of gold rimmed glasses, a brown paper bag containing approximately $93, and a cap gun resembling a revolver, were revealed. The officers seized all of these items.
Later that same evening, the defendant Travis Jackson voluntarily appeared at the First Precinct in the company of his mother and brother. Jackson was informed that he was a suspect in the robbery and that the police were also questioning Larry Davis and Margaret Price. Once at the station house, Jackson was taken to a second-floor office for interrogation while his relatives were asked to wait in another room. The police advised him of his constitutional rights, including the right to be represented by counsel. At this point he told the interrogating officers that he did not wish to speak with them until he had consulted with an attorney, and he requested that they telephone a certain Muslim Mosque in New York City which he said would provide him with a lawyer. The officers made two or three attempts to place the telephone call but they were unable to do so. At one point they permitted Jackson himself to try to reach the number, but he too met with no success.
The defendant then requested permission to speak with his parents and was permitted to do so. Although we do not have the benefit of findings of fact by the hearing judge in connection with the suppression hearing (in contravention of the explicit statutory mandate requiring that these findings be made and stated on the record [CPL 710.60]), a review of the *149 minutes of that hearing reveals testimony from the defendant, his mother, brother and father, who had arrived at the station house by this time, that the defendant claimed to have been physically assaulted by the police while in the other room and that he repeatedly asked his family to get him a lawyer. The police officers, on the other hand, denied that they heard these requests. Following a brief confrontation between the police and the defendant’s family, the police asked them to leave the station house, informing them that the defendant was being arrested in connection with the robbery.
Jackson was then returned to the office where he had previously been held and the interrogating officer, according to his own testimony, "informed him [Jackson] that Larry Davis was still being considered a co-defendant in this case. We gave him the facts as to what took place that day in the robbery.” At this point the defendant was confronted by Mrs. Davis who, in a tearful manner, asked him why he had gotten her son into trouble and pleaded with him to tell the police the truth. Jackson then stated that he did not want to see Larry Davis get in trouble. He admitted that Davis had not known anything about the robbery and that he had used the Davis boy because Davis had a car.
The police then advised Jackson of his constitutional rights for the second time and he signed a waiver. During the course of the ensuing interrogation, Jackson made other incriminating statements. Subsequently the police prepared and Jackson signed a written confession.
We turn first to whether the evidence seized from his room should have been suppressed as the fruit of an illegal search. The prosecution claims that the coat and the other items were in "plain view” and the seizure of them was not unlawful. In the alternative, the People contend that the search of defendant’s room was permissible since Mrs. Davis had consented to a search of the entire house. The defendant, on the other hand, argues that Mrs. Davis was without authority to consent to a search of the room which he rented, and that even if the evidence was in plain view, the police were not justified in engaging in a warrantless search.
The hearing judge was correct in refusing to suppress this evidence. It cannot be denied that the officers were properly in the hallway outside the defendant’s room since they had been given permission to search the house by the owner (Schneckloth v Bustamonte, 412 US 218, 219; Zap v United States, 328 *150 US 624, 630; Davis v United States, 328 US 582, 593-594). From that lawfully obtained vantage point, the record clearly demonstrates that the officers were able to peer through the open doorway into the defendant’s room and before ever entering the room, they spied in plain view an article of clothing matching that described by the victim of the crime as the one being worn by the criminal. On these facts the officers were justified in seizing the coat and the other items revealed during the course of that seizure (see People v Brosnan, 32 NY2d 254; People v Mullgravv, 23 AD2d 855, 856).
In reaching that conclusion we are mindful that "plain view alone is never enough to justify the warrantless seizure of evidence” (Coolidge v New Hampshire, 403 US 443, 468; emphasis in original), and that the discovery of the object must have been inadvertent and not planned or anticipated by the authorities (Coolidge v New Hampshire, supra, at p 466). We have noted that where there is "ample time for the law enforcement officials to secure a warrant” the warrantless seizure of evidence, even if it is in plain view, is forbidden (People v Spinelli, 35 NY2d 77, 81). The present case does not violate the caveat of Coolidge and avoids the infirmity found to exist in Spinelli.
When the police officers returned to Mrs. Davis’ home, the defendant, a prime suspect, was still at large. It cannot be gainsaid that the police were actively seeking to locate him in order to question him in connection with this crime. They had been informed that he lived in the house and their uncontroverted testimony clearly established that, quite naturally, they went to the house to seek him out. The coat itself, and the other evidence subsequently revealed, were easily concealable and could just as easily have been spirited away. Since there was no time to obtain a valid warrant and still insure that this material evidence would be preserved, the seizure was justified (see Chambers v Maroney, 399 US 42, 51-52).
We deal next with the denial of the defendant’s motion to suppress his written confession and the incriminating statements made by him after he had indicated his desire to speak with a lawyer. He contends that his constitutional rights were infringed in that the police continued to interrogate him after he had asserted his privilege to remain silent until he had consulted with a lawyer. The People’s position is that the defendant’s original statement, after his confrontation with Mrs. Davis, was not the product of police interrogation, but *151 was volunteered and therefore was properly not suppressed. Further, it is claimed that once this statement had been made, the police were justified in once again advising Jackson of his rights and obtaining a waiver of them. Hence, it is argued that the inculpatory statements, including the written confession, obtained after the defendant had waived his rights were also properly deemed admissible.
We find that the defendant’s original statement was not voluntary and the People were not justified in attempting to secure, and eventually securing, a waiver of the defendant’s constitutional rights after he had asked to speak with counsel. Therefore, all of the statements made by the defendant after his request for counsel, including the written confession, should have been suppressed.
It is fundamental and a well-established constitutional principle that if a defendant expresses a desire to speak with a lawyer, the police are prohibited from any further interrogation of him until he has been given that opportunity (Miranda v Arizona, 384 US 436, 474; see People v Gary, 31 NY2d 68). It is equally well settled however that "[a]ny statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. * * * There is no requirement that police stop a person who * * * states that he wishes to confess to a crime * * * Volunteered statements of any kind are not barred by the Fifth Amendment” (Miranda v Arizona, supra, at p 478; see People v Kaye, 25 NY2d 139; People v McKie, 25 NY2d 19).
In the instant case it cannot be said that Jackson’s initial inculpatory statement, made shortly following his encounter with Mrs. Davis, was voluntary. A brief re-creation of the scene makes this conclusion manifest. After arriving at the police station the defendant was informed that he was a suspect in a robbery. He was separated from his family and taken to a room occupied by several police officers. He was then advised of his rights and, according to the testimony of the police officer in charge of the investigation, Jackson specifically stated "I will not speak to you unless I speak to an attorney first.” He then asked the officers to place a telephone call for him, and they made two or three attempts to do so. After a brief conference with his family in which he made repeated requests that a lawyer be provided, his parents were asked to leave and he and his family were informed that he was being arrested for the robbery. In spite of this assertion of *152 his constitutional right, the officers did not refrain from any further molestation of Jackson, but rather, by their own testimony, they "informed him that Larry Davis was still being considered a co-defendant in this case. We gave him the facts as to what took place that day in the robbery.” Then, somewhat inexplicably, the crying mother of the other youth confronted Jackson and implored him to clear her son, at which point the defendant made his initial damaging statement.
These factors, taken together, preclude a finding of voluntariness. Rather, they evince the very type of behavior by law enforcement officials which is constitutionally impermissible and Jackson’s "statement * * * cannot be [regarded as] other than the product of compulsion, subtle or otherwise” (Miranda v Arizona, supra, at p 474; see Michigan v Mosley, 423 US 96, 110, n 2 [White, J., concurring]). To hold voluntary a statement obtained only after the defendant has been subjected to a prolonged and almost unbroken series of events which brought to bear enormous, psychological pressure to confess, flies in the face of established constitutional principles (see People v Chapple, 38 NY2d 112, 115; cf. United States ex rel. B. v Shelly, 430 F2d 215, 218). Jackson had clearly requested to speak with a lawyer. The police, in utter disregard of this request and of the defendant’s constitutional rights, continued to subject him to tactics which they must have known might induce the defendant to capitulate and submit to their authority (see People v Watts, 35 AD2d 802, affd 29 NY2d 571; compare People v Carbonaro, 21 NY2d 271). To condone the type of gamesmanship practiced here would enable law enforcement authorities to all too easily circumvent constitutionally mandated procedures.
Finally, we confront the question of the admissibility of the defendant’s statements, including the written confession, after he had been reread the preinterrogation warnings and had signed the waiver. It is true that the assertion of a defendant’s right to remain silent, or to be free from questioning until his lawyer is present, does not bar any subsequent questioning after he has once again been advised of his rights (Michigan v Mosley, 423 US 96, supra; People v Gary, 31 NY2d 68, supra). However, once the défendant has asserted his right, the People must respect it and a subsequent waiver of that right is ineffective where, as here, it is obtained only after continued and unbroken harassment of the defendant (see People v *153 Watts, 35 AD2d 802, affd 29 NY2d 571, supra; cf. Westover v United States, 384 US 436; People v Chapple, 38 NY2d 112, supra).
In the instant case, Jackson was advised of his rights for the second time and the waiver obtained on the heels of an ongoing interrogation. There was no significant hiatus in this continuum of confrontation. The defendant was not allowed to return to the point where he was no longer under the influence of the prior impermissible interrogation (see People v Chapple, supra, at p 115) and therefore it cannot be said that the People have met their burden in establishing a knowing, willing and voluntary waiver of his rights (see Miranda v Arizona, 384 US 436, 475, supra; People v Ramos, 40 NY2d 610, 618).
Accordingly, the order of the Appellate Division should be reversed, and all of the defendant’s statements should be suppressed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
Order reversed, defendant’s statements suppressed and a new trial ordered.